OPINION OF THE COURT
Gabrielli, J.
The present appeal arises out of nonjury trial of a dentist who stands convicted of sexually abusing two female patients while they were under the effects of sedation at defendant’s office. A camera, which had been secreted in defendant’s treatment room pursuant to a warrant, recorded one of the alleged incidents of áexual abuse. Several issues are raised on appeal, including the propriety of admitting into evidence a video tape of defendant’s activities. In affirming defendant’s conviction, we hold today that a warrant may issue to authorize the video taping of evidence to be admitted at a subsequent trial, provided certain procedures are followed and certain safeguards are observed.
The defendant, a dentist practicing in Manhattan, was convicted of two counts of sexual abuse in the first degree (Penal Law, § 130.65, subd 2) for allegedly subjecting two female patients to sexual contact while they were “incapable of consent by reason of being physically helpless”. *643 The indictment upon which defendant was tried contained three counts of sexual abuse predicated upon the complaints of three of defendant’s patients: Susan Hyman, Randi Carson and Dorothy Beineix. Each of the complainants alleged that they were subjected to physical contact of a sexual nature as they were recovering from the effects of sedation administered by defendant.
Susan Hyman first went to defendant’s office to have a wisdom tooth extracted. After she expressed her fear that novocaine would not sufficiently deaden her pain, Dr. Teicher offered to use another method. Then, presumably to determine if she would suffer any adverse effects from the administration of a general sedative, he performed several tests on his patient and thereafter injected a fluid into her arm causing her to lose consciousness.
At trial Hyman testified that she awoke from her state of unconsciousness when she heard someone calling her name and felt something was touching her face. She opened her eyes and saw an exposed penis directly in front of her. Closing her eyes again, she reopened them to see a pair of trousers being zipped shut. Defendant then slapped her face, touched her blouse and lifted her from the dental chair. Hyman was still groggy and could not control her arms and legs. Defendant told her to “ventilate” her arms and he then drew her close to him and kissed her. While the patient was still unable to stand, defendant, while supporting her body, moved his hands over her breasts and thighs.
Several days following this encounter Ms. Hyman reported the incident to the police. The police equipped her with a hidden microphone before her next visit to the dentist, but when she questioned defendant about his prior activities he refused to admit that he had sexually assaulted her. He did, however, ask Ms. Hyman to join him at his hotel room. She refused his invitation, agreeing instead to meet with him at a nearby bar. On this next rendezvous Hyman was once more equipped with a recording device, but once again defendant made no admission of illegal conduct.
The police also received a complaint from Randi Carson, who had initially gone to defendant’s office for an examina *644 tion and X rays and later returned for further treatment. As in Ms. Hyman’s case, the defendant gave Ms. Carson a drug, which caused her to lose consciousness immediately. When she awakend she was assisted into a recovery room and, while she was resting there and still overcoming the effect of the drug which had been injected, defendant entered the room and closed the door behind him. No one else was present. Defendant at first tried to lift Carson to a standing position, but his efforts were unsuccessful. He then lifted her hand and placed it on his pants directly over his penis. Although she was still weak, Carson testified she was able to pull her hand away. Carson also testified that defendant kissed her during this encounter and made a remark which she understood as a request to perform an act of oral sex. In addition, according to Carson, he repeatedly asked her to meet with him at his hotel room. Later, upon arriving home, Carson noticed that her underwear was wet and that there was a soreness on the left side of her vagina which she had not felt before her visit to the doctor. That evening Carson brought her complaints to the police.
Carson later returned to defendant’s office wearing a hidden microphone supplied by the police, but no further acts of sexual abuse were recorded or observed by the patient. After this visit defendant telephoned Carson several times at her home to ask her if he could visit with her. Finally, Ms. Carson again returned to defendant’s office with a microphone. In response to her attempts to elicit admissions of sexual abuse from the dentist, however, defendant told her only that the drug he had injected had caused her to imagine the incident of which she later testified.
As a result of these complaints by Hyman and Carson and the unsuccessful efforts of the police to obtain additional incriminating evidence against the dentist, the District Attorney’s office obtained a warrant authorizing the police to install a camera in defendant’s office to monitor his treatment of patients who had consented to the taping. Pursuant to a prearranged plan, Police Officer Dorothy Beineix then went to defendant’s office and made an appointment to *645 have a wisdom tooth extracted at a later date. On the morning of Officer Beineix’ appointment, the police entered defendant’s office and installed the camera in a ceiling ventilator in one of defendant’s examining rooms. The camera, which was focused on the dentist’s chair, was connected to a video recorder and was monitored by police officers who were waiting in the basement of the building.
Later that morning, Ms. Beineix returned to defendant’s office to keep her appointment. Defendant first checked her pulse and blood pressure and then lifted her blouse to examine her chest with his stethescope. During this preliminary examination he instructed her that if she began to have difficulty breathing she should stand, lift her arms and breathe deeply. Following the examination, defendant administered a drug which caused Beineix to lose consciousness. While Beineix was unconscious defendant extracted her tooth and, at one point during this procedure, lifted her blouse and again examined her bare chest with his stethescope. During this entire period, defendant and Ms. Beineix were alone in the treatment room. As Ms. Beineix began to regain consciousness, defendant asked her to stand and put her arms around him. Since she had no control over her body at this time, Beineix told the doctor that she was unable to stand. Defendant then lifted her out of the dental chair and pulled her towards him. While sitting on a stool in front of the dental chair with Ms. Beineix between his legs, defendant lifted her blouse and began moving his hands across the upper part of her back and around toward her breasts. He then slid both hands down across her back and grabbed her buttocks. While massaging her buttocks in a circular motion he drew her body toward his. All of these actions were recorded on the video tape which was later admitted into evidence.
At this point the officers who were monitoring the video tape in the basement signaled other officers to arrest defendant. Detective Brech and Investigator Dadona were the first to enter the treatment room. Dadona testified at trial that when he first opened the door he observed that defendant’s hands were on Ms. Beineix’ sides, and that his thumbs were massaging the nipples of her breasts.
*646 At his subsequent trial defendant was convicted of two counts of sexual abuse in the first degree for the acts committed upon complainants Carson and Beineix. The count involving the complaint of Susan Hyman was dismissed, however, because the court found that defendant’s guilt had not been established beyond a reasonable doubt. A divided Appellate Division affirmed defendant’s conviction on both counts, and leave to appeal to this court was thereafter granted. Defendant now attacks the judgment of conviction on several grounds.
Defendant first contests his conviction on the count concerning the Carson incident on the ground that the evidence at trial was insufficient, as a matter of law, to establish his guilt. The statute under which defendant was convicted provides that a person is guilty of sexual abuse in the first degree when he subjects another person to sexual contact “[wjhen the other person is incapable of consent by reason of being physically helpless” (Penal Law, § 130.65, subd 2). Sexual contact is defined in the Penal Law as “any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying the sexual desire of either party” (Penal Law, § 130.00, subd 3). Defendant claims that the evidence at trial was insufficient to establish that Ms. Carson was incapable of consenting to the touching and that there was no evidence to establish that this touching was for sexual ' gratification. Neither of these claims is supported by the record.
Carson was heavily sedated at the time the initial touching occurred and, as a consequence, she was in an extremely weakened condition. Thus, although she had enough control over her body to pull her hand away after defendant had placed it against his penis, the trier of fact was entitled to infer that she lacked capacity to consent to the original touching because of her generally weakened condition. Furthermore, we find defendant’s contention that the touching was too fleeting to establish the element of sexual gratification to be frivolous. The statute does not require that actual gratification occur, but only that the touching be for that purpose. Defendant’s act of placing his patient’s hand *647 against his covered penis was more than sufficient to permit a trier of fact to find that the purpose of this act was sexual gratification.
Defendant also argues that even if the element of sexual gratification and the victim’s incapacity were established, his act of placing Carson’s hand against his genital area could not possibly constitute the crime of sexual abuse, since the statute proscribes only the act of a defendant who touches the intimate parts of his victim and not the act of a person who places his victim’s hand against his own intimate parts. As we have held, this argument must be rejected because it requires an overly restrictive and improper reading of the statutory language (see People v Ditta, 52 NY2d 657 [decided herewith]). The common-law policy that a penal provision should be strictly construed has been expressly abolished by the Legislature; instead penal statutes are to be interpreted “according to the fair import of their terms to promote justice and effect the objects of the law” (Penal Law, § 5.00) and are not to be given hypertechnical or strained interpretations (People v Ditta, supra, citing People v Sansanese, 17 NY2d 302, 306; People v Wood, 8 NY2d 48, 51).
Addressing the other count upon which defendant was convicted, that involving the sexual abuse of Dorothy Beineix, defendant once more challenges the sufficiency of the evidence, and also asserts that, for various reasons, the introduction into evidence of a video tape of his actions relating to the Beineix incident was improper. For reasons which follow we also uphold defendant’s conviction under this count of the indictment.
The evidence upon which the People’s case was built consisted primarily of the video tape of defendant’s actions, the testimony of Inspector Dadona and Dorothy Beineix and, finally, the testimony of an expert witness who attempted to refute defendant’s claim that his actions were medically necessary. The camera which recorded defendant’s activities was positioned in such a way as to give a view overlooking the dental chair and a portion of the room. The relevant portion of the video tape revealed that after defendant had completed the extraction of Beineix’ tooth, *648 he lifted his patient from the dental chair and placed her between his legs. At this moment defendant was sitting atop a stool and supporting Beineix in a standing position. It could readily be inferred from a viewing of the tape that the patient had no control over her body at this point. Defendant then lifted Beineix’ blouse and moved his hands across her back. Although, because of the camera angle, it cannot be determined from the tape whether defendant actually placed his hands upon Ms. Beineix’ breasts, the tape does reveal that he massaged her buttocks with, both hands and pulled her toward his pelvic region. In addition to the video tape, the People also produced Inspector Dadona, who entered the treatment room at the signal of the officers monitoring the video tape and was therefore able to give eyewitness testimony of what transpired. He testified that when he first entered the office he observed defendant holding Beineix by her sides and massaging the nipples of her breasts with his thumbs. Although Beineix testified at trial that she could not recall if defendant had massaged her breasts, she was able to recall that he moved his hands across her body and down to her buttocks, causing her to become very frightened.
Defendant first contends that there was no proof that Beineix was incapable of consent by reason of being physically helpless. Noting that when he first told her to stand she responded that she was unable to do so, defendant argues that the crime of sexual abuse was not made out because there was no proof that Beineix could not communicate her unwillingness to submit to the subsequent touching. She did, however, testify that she had no control over her body, although she was mentally aware. As the People assert, simply because Beineix was unable to respond to defendant’s direct command to stand does not prove, as a matter of law, that she was able to protest every subtle movement of his hand across her flaccid body. The People’s medical expert testified at trial that when a patient is raised to a standing position, as in this case, there may be a decrease in the cerebral blood flow which could result in dizziness or even unconsciousness. In addition, the doctor testified that this effect is merely compounded by the ap *649 plication of chest compression. The state of the victim’s physical helplessness at any given moment is largely a question of fact which, in view of this and other testimony, we may not question upon this record. Furthermore, we reject the notion that the victim’s status as a police decoy resulted in implicit consent to the physical touching because, as defendant claims, she voluntarily placed herself in a position to incur this abuse. Her consent to acting as a police decoy is not equivalent to a consent to a touching of her intimate parts, which she was physically incapable of giving at the time of the illegal activity.
Defendant also asserts that there was insufficient proof that any improper touching occurred because the tape was inconclusive on this point and, further, because the testimony of Inspector Dadona was not worthy of belief. The visual material on the tape, however, did not serve to disprove, on the contrary was consistent with, the conclusion that an unlawful touching occurred, even though the camera angle precluded an unobstructed view of all of defendant’s activities. And, inasmuch as Inspector Dadona’s testimony was not, as a matter of law, incredible, the trier of fact was entitled to consider his testimony as direct evidence that the described touching actually occurred.
Finally, defendant attacks the sufficiency of this evidence by asserting that the People have failed to prove, beyond a reasonable doubt, that the touching of Beineix was not performed pursuant to a valid medical procedure. Indeed, throughout the course of this litigation defendant’s position has been that the actions which he took were part of a necessary medical treatment to bring Beineix out of a state of respiratory distress through the application of pressure on her ribcage. In support of these assertions defendant produced two experts at trial who indicated that the actions depicted on the tape could be a form of resuscitory technique. Interestingly, they also indicated, however, that this technique was neither taught nor recommended, that it was unknown to them and, in fact, would probably be employed only by a minimally trained practitioner. Moreover, the People produced an expert witness who testified in substance that the tape reveals that Beineix was not in need *650 of respiratory assistance and that, even if she were, the method of resuscitation employed by defendant would in fact be detrimental to his patient rather than helpful. In light of this evidence the trier of fact had more than ample basis for rejecting defendant’s contention that his actions were dictated by any claimed medical necessity.
Defendant’s next assertions go not to the sufficiency of the evidence at trial, but to the propriety of permitting the video tape of his activities involving Ms. Beineix to be introduced into evidence. This matter presents questions of first impression before this court.
Defendant’s initial contention is that Supreme Court had no power to issue a warrant authorizing the type of surveillance which took place in this case. There is, of course, no doubt that the Supreme Court had the power to authorize the aural recording of the events in defendant’s office. The authority of a court to permit aural electronic surveillance is derived from CPL article 700. This article deals with the use of eavesdropping warrants, and defines eavesdropping as wiretapping or mechanical overhearing of a conversation (CPL 700.05, subd 1). Defendant, however, argues that article 700, by its express terms, may not be read as conferring on the courts the power to authorize video electronic surveillance.
Initially, we note our agreement with defendant’s contention that CPL article 700 does not apply to video surveillance.[1] This article applies only to eavesdropping, which is defined as wiretapping or mechanical overhearing of a *651 conversation (CPL 700.05, subd 1). The statutory language is directed toward the aural acquisition of information, and does not mention the acquisition of visual images.
Nevertheless, we believe that the warrant which permitted video surveillance in this case was valid, since it was authorized by the provisions of CPL article 690. CPL 690.-10 (subd 4) provides that “[p]ersonal property is subject to seizure pursuant to a search warrant if there is reasonable cause to believe that it * * * [c] onstitutes evidence or tends to demonstrate that an offense was committed or that a particular person participated in the commission of an offense”. Defendant maintains that this statute authorizes only the seizure of tangible property and does not permit the seizure of an intangible visual image secured by a video recording. We reject this interpretation.
In People v Abruzzi (52 AD2d 499, affd on opn below 42 NY2d 813, cert den 434 US 921), the court reversed the conviction of a doctor who had been convicted for certain acts of sexual misconduct largely upon the testimony of a police officer who had observed defendant’s actions while perched on a ladder outside the doctor’s window. The Abruzzi court held that the defendant’s motion to suppress this evidence should have been granted because it was procured without the authorization of a warrant. Implicit in this holding is the premise that a proper warrant may issue to permit the seizure that results from obtaining visual observations of a crime in progress in a private place. Similarly, in United States v New York Tel. Co. (434 US 159), the Supreme Court had occasion to determine if rule 41 of the Federal Rules of Criminal Procedure, which closely parallels the language of CPL 690.10 (subd 4), authorizes the issuance of a warrant to seize intangible evidence. One of the issues in that case was whether a Federal District Court could issue a warrant authorizing the use of a pen register.[2] The court determined that rule 41 is sufficiently *652 broad to include seizures of. intangible items such as dial impulses recorded by these devices, and also noted that in Katz v United States (389 US 347) the court had held that rule 41 was sufficiently flexible to include the power to authorize the seizure of conversations. We believe that the similarity in the wording of rule 41 and CPL article 690 is sufficient to permit analogy. Accordingly, we conclude that the court in the instant case was authorized under CPL article 690 to issue a warrant for the seizure of intangible visual images in defendant’s office.
Defendant also contends that even if such a warrant is authorized under the CPL, the warrant in this case must nevertheless fall because it did not comply with the provision of title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968 (US Code, tit 18, _§§ 2510-2520). This is based upon the assumptions that title III applies to the area of visual electronic surveillance and that this provision pre-empts State law. Although we have previously held that title III does indeed pre-empt State law in the area of electronic surveillance (People v Shapiro, 50 NY2d 747), this fact is unavailing in the present case, since title III does not apply to the field of video electronic surveillance and indeed, does not prohibit the type of surveillance here employed.[3]
Title III, also often referred to as the Federal wiretapping statute, prescribes the procedure for securing judicial authority to intercept wire or oral communications in the investigation of specified serious offenses. Similar to the *653 provision of CPL article 700, which was drafted to conform to the provisions of the Federal act (see Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL art 700, p 243), title III deals only in the aural acquisition of the contents of any wire or oral communication. As the language and legislative history of that statute makes clear, it was never intended to address the use of video surveillance equipment (see Carr, Electronic Surveillance, § 3.08, p 124; Senate Report No. 1097, 90th Cong, 2d Sess, US Code Cong & Admin News, 1968, p 2178).[4]
Defendant makes one final argument concerning the video tape evidence which deserves attention. He maintains that the use of visual surveillance is so intrusive that any act of this nature should be deemed unreasonable per se under the Fourth Amendment. While we agree with defendant’s concern over the high degree of intrusiveness that is inherent in this form of surveillance, we cannot agree that such activities are per se unreasonable and must be prohibited under all circumstances. Certainly the Orwellian overtones involved in this activity demand that close scrutiny be given to any application for a warrant permitting video electronic surveillance. Nevertheless, the Fourth Amendment does not mandate an absolute ban on video surveillance any more than it mandates a total proscription on electronic eavesdropping. Indeed, there may be situations such as the present one where the intrusion resulting from such surveillance is warranted because of the State’s high interest in gathering evidence of criminality and its inability to achieve this goal through less intrusive means.
Although there are at present no significant statutory limitations in the field of video electronic surveillance, we are not completely without guidance in this area. In Berger v New York (388 US 41) and Katz v United States (389 US 347, swpra), both of which predated the advent of title III in the area of electronic eavesdropping, the Supreme *654 Court set forth the minimum constitutional standards governing the use of aural electronic surveillance. Because of the substantial similarities between this form of surveillance and the video electronic surveillance which took place in this case, we believe that the standards announced in Berger and Katz are applicable with equal force to the present situation. And, contrary to defendant’s assertions, we believe that these constitutional standards were here satisfied.
The first requirement for a warrant authorizing video electronic surveillance, as with any warrant, is that there be a showing of probable cause. In situations involving this form of search, there must be probable cause to believe that a particularly described person is committing, has committed,. or is about to commit a crime, probable cause to believe that the place where the áctivity is to be intercepted is being used or is about to be used in connection with the commission of the crime by that described person, and also probable cause to believe that a particular activity related to that crime will be observed through the use of video electronic surveillance (see Berger v New York, supra; cf. CPL 700.15, subds 2, 3, 5). Such probable cause was clearly established by the affidavit offered by the District Attorney in support of his application for a warrant, which fully set forth the facts leading up to the Beineix incident.
The Constitution also requires particularization in the warrant. Specifically, the Fourth Amendment commands that the warrant must particularly describe “the place to be searched, and the * * * things to be seized”. In the area of video electronic surveillance, as in the area of electronic eavesdropping, the particularization requirement includes specification of the crime under investigation, specification of the type of activity sought to be captured by the camera and also specification of the person expected to be seen performing the activity. The obvious purpose of this requirement is to limit the discretion of the officers in executing the search. Here, all of these requirements were satisfied. Although the warrant did not specify the particular room in which the camera was to be placed, the affidavit, which was incorporated in the warrant, did specify that the camera *655 was to be placed in defendant’s dental office and was to focus upon the dental chair in which consenting patients would be seated. While defendant apparently had two treatment rooms, we nevertheless conclude that the limitation upon the place to be searched was sufficiently specific to obviate the danger of a general rummaging for evidence or a search of impermissibly broad scope (see Coolidge v New Hampshire, 403 US 443).
Minimization is also necessary for a warrant authorizing video electronic surveillance. In Berger, the court expressed concern that conversations of persons coming into an area covered by an eavesdropping device might be unnecessarily and indiscriminately seized without regard to their connection with the crime under investigation. This concern is equally compelling when visual surveillance is employed. The warrant in this case explicitly provided, however, that the surveillance be conducted in such a way as “to minimize the recording of activities not related to the [specified] crimes”. Moreover, the incorporated affidavit expressly limited the view of the camera to the dental chair in defendant’s office and specified that the device would be turned on only when consenting females were in the treatment room. These limitations were sufficient to ensure that the surveillance would be confined to the observation of the activities for which the warrant was issued.
Finally, before a warrant authorizing unconsented video electronic surveillance may issue, it must be established that there are no less intrusive means for obtaining the needed evidence. Since electronic surveillance of any kind is necessarily surreptitious and constitutes an extensive invasion of the individual’s privacy, it may only be permitted where normal investigative procedures had been tried and had failed or are demonstrably unlikely to succeed. Defendant contends that such a showing could not be made in this case, but the facts do not bear out his contention. Before applying for the warrant the police had questioned defendant about one of the complaints of sexual abuse, had equipped two of the female complainants with hidden recorders and transmitters in an attempt to elicit admissions from defendant, and had tapped the telephone of a complainant who *656 had received repeated calls from defendant. Furthermore, the use of a police decoy without the protection of visual surveillance would not have produced the needed evidence in this case, since the decoy, of necessity, would have been heavily sedated and might not have been able to relate what transpired. Under these circumstances it cannot be said, despite defendant’s protestations to the contrary, that the police failed to make a sufficient showing of necessity before obtaining the warrant.
As we have stressed, the constitutional requirements outlined for eavesdropping in Berger v New York (388 US 41, supra), and Katz v United States (389 US 347, supra) are equally applicable to the area of video electronic surveillance. While we have discussed several of these requirements in the instant case, our opinion should not be construed as an inventory of each of the necessary elements for such a warrant. The degree of intrusiveness inherent in video electronic surveillance demands unswerving adherence to each of the limitations placed upon the use of this device. Moreover, because the use of this investigative technique poses a threat to the privacy of citizens, legislative scrutiny of the field and the enactment of specific guidelines would appear to be in order.
We have considered defendant’s remaining contentions and conclude that they are without merit.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Fuchsberg and Meyer concur.
Order affirmed.

. The police obtained the aural portions of the video tape by planting a microphone in Beineix’ purse, which she carried into the treatment room. In general, if one of the parties to an intercepted conversation consents to the recording or mechanical overhearing of that conversation, the provisions of CPL article 700 do not apply (see CPL 700.05, subd 1; Penal Law, § 250.00; see, also, United States v White, 401 US 745). Although the fact that Beineix was unconscious during her dental treatment might have some bearing on an analysis under United States v White, we have no need to consider the question since defendant does not separately contest the aural portion of the tape, perhaps because it contains little of an inculpatory nature. Additionally, we note, without deciding, that if a consenting party carries a camera on her person, the seizure which occurs might not be subject to the warrant requirement (cf. United States v White, supra). This issue is not before us, however, because the camera used in this case was planted in defendant’s office pursuant to a court-authorized entry of the building.

. The Supreme Court described a pen register as “a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed” (United States v New York Tel. Co., 434 US 159, 161, n 1, supra).

. Title III specifies that an eavesdropping warrant may issue only for certain specified crimes, namely “murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crimes dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing * * * interception, or any conspiracy to commit any of the foregoing offenses.” (US Code, tit 18, §2516, subd [2]). In People v Shapiro (supra) we held that allegations of prostitution and sexual abuse predicated upon the inability of the victim to consent by reason of age did not fall within this list of enumerated crimes. On the basis of our holding in Shapiro, defendant argues that the Federal act also precludes electronic surveillance in cases involving only the crime of sexual abuse committed against a victim who is incapable of consent by reason of physical helplessness.

. Specifically, the Senate report provides as follows: “Paragraph (4) defines ‘intercept’ to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation”.